UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES HENRY ARTHUR,

      Petitioner,                    Case No. 2:07-CV-13444

v.

                                    HON. AVERN COHN

GREG McQUIGGIN,

      Respondent.

_____/

**MEMORANDUM AND ORDER DENYING PETITION FOR WRIT OF HABEAS
CORPUS, DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND
GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS**

**I. Introduction**

This is a habeas case under 28 U.S.C. § 2254.  Petitioner Charles Henry Arthur

(Petitioner) is a state inmate at the Cotton Correctional Facility in Jackson, Michigan.

Petitioner is serving a sentence of life imprisonment without the possibility of parole

following his convictions on two counts of first-degree premeditated murder, Mich.

Comp. Laws § 750.316(a); and conspiracy to commit first-degree premeditated murder,

Mich. Comp. Laws §§ 750.157a; 750.316(a).  Petitioner is also serving term sentences

on the following:  forty to sixty years for armed robbery, Mich. Comp. Laws § 750.529;

forty to sixty years for conspiracy to commit armed robbery, Mich. Comp. Laws §§

750.157a; 750.529; forty to sixty years for carjacking, Mich. Comp. Laws § 750.529a;

forty to sixty years for conspiracy to commit carjacking, Mich. Comp. Laws §§ 750.157a;

750.529a; ten to twenty years for carrying a concealed weapon, Mich. Comp. Laws §

750.227; and a consecutive two year sentence for felony-firearm, Mich. Comp. Laws §

750.227b.  Petitioner has filed a pro se petition for writ of habeas corpus claiming that

he is incarcerated in violation of his constitutional rights.  Respondent, through the

Attorney General's Office, filed a response, arguing that Petitioner's claims are

meritless, procedurally defaulted, or barred by the statute of limitations.  For the reasons

which follow, the petition will be denied.

## II.  Procedural History

Petitioner was convicted following a jury trial in the Saginaw County Circuit Court.

He was sentenced as described above.  Petitioner filed an appeal of right to the

Michigan Court of Appeals, which affirmed Petitioner's conviction and sentence. People

v. Arthur, No. 254056 (Mich.Ct.App. Sept. 29, 2005).  Petitioner then filed an application

for leave to appeal with the Michigan Supreme Court, which was denied. People v.

Arthur, 474 Mich. 1071 (2006).  Petitioner then filed a petition for writ of certiorari with

the United States Supreme Court, which was also denied.  Arthur v. Michigan, 549 U.S.

854 (2006).

In 2007, Petitioner filed his petition for writ of habeas corpus, which was held in

abeyance so that Petitioner could return to the state courts to exhaust additional claims.

Arthur v. McQuiggin, No. 07-CV-13444; 2009 WL 1244157 (E.D. Mich. May 5, 2009).

Petitioner returned to the state court and filed a post-conviction motion for relief

from judgment, which was denied. People v. Arthur, No. 03-022745-FC (Saginaw Cnty.

Cir. Ct. Apr. 8, 2010).  The Michigan appellate courts denied Petitioner's application for

leave to appeal. People v. Arthur, No. 302919 (Mich.Ct.App. Sept. 20, 2011); lv. den.

492 Mich. 852 (2012); reconsideration. den. 493 Mich. 858 (2012).

On January 9, 2013, the Court reopened petitioner's case and permitted him to

file an amended habeas petition.  In his original and amended habeas petition,

2

Petitioner seeks habeas relief on the following grounds:

I. THE JURY WAS EXPOSED TO EXTRANEOUS INFLUENCE (PEOPLE WHO WERE PERCEIVED AS "INTIMIDATING") AND THERE IS A REAL AND SUBSTANTIAL POSSIBILITY THAT THESE INFLUENCES COULD HAVE AFFECTED THE JURY'S VERDICT. THE TRIAL COURT ERRED IN DENYING PETITIONER'S REQUEST TO QUESTION THE JURORS. PETITIONER HAD A RIGHT UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS TO A FAIR AND IMPARTIAL JURY UNTAINTED BY EXTRANEOUS INFLUENCE.

II. THE REPEATED REFERENCES TO PETITIONER AS "FRANK NITTY," AN INFAMOUS GANGSTER, UNFAIRLY PREJUDICED THE JURY AGAINST HIM AND DEPRIVED HIM OF THE RIGHT TO A FAIR TRIAL: (1) IT VIOLATED THE MICHIGAN RULES OF EVIDENCE, AND (2) IT WAS PROSECUTORIAL MISCONDUCT UNDER THE STATE AND FEDERAL CONSTITUTIONS.

III. TRIAL COUNSEL MADE BIG MISTAKES WHICH CONSTITUTE INEFFECTIVE ASSISTANCE UNDER THE SIXTH AMENDMENT. THEY REQUIRE A NEW TRIAL OR GINTHER HEARING. THE ERROR LIKELY CHANGED THE OUTCOME OF THIS TRIAL: (1) COUNSEL FAILED TO ADEQUATELY QUESTION CHRISTINE RAY; (2) COUNSEL FAILED TO USE EXCULPATORY PHONE RECORDS; (3) COUNSEL FAILED TO CALL VANESSA GREEN, EVEN THOUGH SHE TOLD POLICE MR. SMITH WAS ALONE WHEN HE DID THE SHOOTING; AND (4) FAILED TO ADDRESS APPARENT PROSECUTORIAL MISCONDUCT.

IV. PETITIONER'S RIGHTS UNDER THE CONFRONTATION CLAUSE OF THE UNITED STATES CONSTITUTION WERE VIOLATED. ADMISSIONS AND STATEMENTS OF LOU SMITH, A NON-TESTIFYING CO-DEFENDANT AND ALLEGED CO-CONSPIRATOR, WERE REPEATEDLY USED AGAINST PETITIONER AT TRIAL. A NEW TRIAL IS WARRANTED.

V. PETITIONER'S CONVICTIONS FOR MURDER AND CARJACKING OFFENSES MUST BE REVERSED BECAUSE THE PROSECUTION FAILED TO PRESENT SUFFICIENT EVIDENCE TO SATISFY THE DUE PROCESS STANDARD OF GUILT BEYOND A REASONABLE DOUBT. U.S. CONST AM V, XIV; MICH CONST ART I, SEC 17.

VI. PETITIONER HAS SHOWN "GOOD CAUSE" FOR THE PRODUCTION OF TRANSCRIPT EXCERPTS FROM MR. SMITH'S TRIAL (THE TESTIMONY OF SMITH, CHRISTINE RAY, AND VANESSA GREEN) AS REQUESTED DURING THE POST-CONVICTION HEARING.

3

VII. PETITIONER IS ENTITLED TO WRIT OF HABEAS CORPUS ON HIS CLAIM THAT HE WAS DEPRIVED OF A FAIR TRIAL AND IMPARTIAL TRIAL BY ELICITATION OF IMPROPER TESTIMONY FROM IMMUNITY WITNESS RAY AS TO HER ALLEGED FEAR OF PETITIONER CONTRARY TO HIS U.S. CONSTITUTIONAL RIGHTS UNDER THE 5TH, 6TH & 14TH AMENDMENT.[1]

### III.  Facts

The material facts leading to Petitioner's conviction are gleaned from the record as follows.

On December 19, 2002, around 9:00 p.m., police discovered two dead bodies inside a of a Chevrolet Suburban parked near a police station in Mount Morris Township, Michigan. (Tr. 1/20/04, pp. 36, 49).  The victims had been shot "execution style." (Tr. 1/22/04, pp. 13, 24).  A firearms expert testified that the three bullets that were recovered from the crime scene could have been used in the same firearm. (Tr. 1/23/04, pp. 96-97).  Police found Shantell Draine (Draine) walking away from the Suburban in the rain.  Draine was arrested.  Blood was found on his clothing. (Tr. 1/20/04, pp. 38-41, 53, 60).

Draine testified against Petitioner in exchange for receiving complete immunity from prosecution. (Tr. 1/20/04, pp. 81-83).  He testified at trial as follows.  On the morning of December 19, 2002, Draine's friend, Lou Smith (Smith), picked him up.

---

[1]  Respondent asserts in his supplemental answer that Petitioner intended to drop his sixth claim, arguing that although he raised it in his original habeas petition, he did not re-assert it in his amended habeas petition, instead substituting what is now his seventh claim in place of the sixth claim contained within the original habeas petition.  In reply, Petitioner says that his failure to include his sixth claim within his amended habeas petition was inadvertent and asks that it be included for consideration by the Court.  Noting that Petitioner is proceeding pro se, the Court will review Petitioner's sixth claim.

Smith, Draine, and Bridgitt Neal (Neal) rented a room at the Knights Inn, where they used marijuana and cocaine. (Id., pp 85, 88, 91).  Draine testified that Smith took cell phone calls from a man identified by Smith as "Frank Nitty," which was Petitioner's purported nickname. (Id., pp. 92, 156-157).  After speaking with Petitioner, Smith left, saying he was going to meet with Petitioner in order to commit a robbery.  Neal also left. Smith subsequently returned with Petitioner to the motel.  Petitioner suggested to Draine and Smith that they rob and kill a man who was bringing in eighteen ounces of cocaine from Detroit, after which Draine would drive that man's truck to Flint. (Id., pp. 98-103).

Draine further testified that Smith, and Neal left the motel and drove to an apartment complex in Saginaw.  Petitioner gave a chrome revolver to Smith.  The men returned to the Knights Inn and again spoke of committing a robbery.  Petitioner made a phone call and indicated that he had located persons who were willing to purchase cocaine.  Smith and Petitioner left to meet to the man bringing the cocaine from Detroit. Draine remained at the motel pursuant to the agreed upon plan. (Id., pp.105-10).

Draine further testified that Smith and Petitioner returned to the motel that night with blood on their clothes.  Both men were in possession of fifteen ounces of powder cocaine and a large amount of money.  Petitioner informed Draine that he killed a girl and that Smith killed a man at Smith's house. (Id., pp. 110-114).  Draine initially told the police that Smith said that he killed both victims.  Draine changed his story when the police told him that he was lying. (Id., pp. 159-64, 183-86).  Smith and Petitioner left before returning again with Smith's girlfriend, Christina Ray (Ray). (Id., p. 115). Petitioner ordered Draine to put a gun inside a car. (Id., p. 171).  Draine testified that

5

Ray went to a Kmart and purchased two jogging suits and two pairs of tennis shoes. Smith and petitioner removed their bloodied clothes and put on these items. (Id., pp. 115-22).

At some point thereafter, Draine testified that he, Smith, and Ray went and retrieved the Suburban and the two victims' bodies. (Id., pp. 126,131). Draine then drove the Suburban to the home of Smith's cousin, Carlton Tinsley. Smith and Ray followed in a van. At Tinsley's house, Draine removed a jacket from one of the bodies and placed it into a washing machine. Smith carried items from the Suburban into the home. (Id., pp. 134-40).

Draine, Smith, and Ray then traveled toward Flint. Draine abandoned the Suburban and was arrested within moments. (Tr. 1/20/04, pp. 142-46, Tr. 1/21/04, p. 51). Draine concluded his testimony admitting that he would do whatever the police wanted him to do in order to save himself. (Tr. 1/20/04, p. 187).

Neal also testified. She testified that had been addicted to cocaine and that Smith was her drug supplier. (Tr. 1/20/04, pp. 188-91; Tr. 1/21/04, pp. 28-30). On December 19, 2002, Smith took Neal to the Knights Inn. Neal testified that Smith took cell phone calls from Petitioner. (Tr. 1/20/04, pp. 200-01). Neal left the motel around 1:00 p.m. and returned at around 8:00 p.m. (Id., pp. 203-05). Petitioner was at the motel by himself. Petitioner used some cocaine and left after 5-10 minutes. (Tr. 1/21/04, pp. 5-8, 26, 32). At 10:30 p.m. Smith returned to the motel in a blue jogging suit. (Id., pp. 8, 19). Smith returned a second time with Ray, beer, marijuana and cocaine. Neal then testified that a short time later, police entered the room and arrested Smith and Ray. (Id., pp. 12-17, 44).

6

Ray testified she had been Smith's fiancee. Although she claimed that their relationship was over, Ray admitted that she continued to correspond with Smith while he was incarcerated in jail. Ray told the police that she loved Smith. Ray was granted immunity from prosecution in exchange for testimony. (Tr. 1/21/04, pp. 126-128, 187). Ray testified that Smith was a violent man during their relationship and that she feared him. (Id., p. 216). On the day of the murders, Ray testified that she picked her children up from school in the afternoon. As she drove past her house, she noticed Petitioner standing in the back door of a unknown Suburban. (Id., pp. 133, 136). Ray went inside her house, where she found Smith and Petitioner in her kitchen. Ray smelled the odor of bleach and saw a bleach bottle. Smith told Ray that he was cleaning a "mess." (Id., pp. 137-41). Ray left her home with Smith and Petitioner and drove to the Knights Inn. Smith then sent Ray to the Kmart. (Id., pp. 142-49). Ray testified that later that night, Smith and Petitioner were wearing items that she had purchased for them at Kmart. (Id., pp. 154-55).

When Ray returned to the Knights Inn, she, Smith, and Draine got into their van and left. (Id., pp. 156-158). Smith had Ray retrieve a revolver from a garage and then drive to his mother's home where they left the Kmart bag. (Id., pp. 160, 164-167). Ray and Smith subsequently followed Draine to Carlton Tinsley's house, where Smith and Draine removed items from the van. Smith ordered Ray to follow Draine and the Suburban. On the highway, Ray testified that "[Smith] told me to not speed, to keep up with him because he had two dead bodies in the truck." (Id., pp. 170-75, 203). Smith told Ray that Petitioner wanted them to return to the Knights Inn. (Id., pp. 180, 207). After leaving Draine and returning to the Inn, Ray and Smith were arrested. (Id., pp.

7

176-79).

After speaking with Draine, police went to Carlton Tinsley's home, where they recovered a leather jacket and stereo amplifier that had been removed from the Suburban. Police found blood on the inside lid of a washing machine. (Tr. 1/21/04, pp. 84, 87). At Ray's home, police located a blood smear on an interior hallway. In the kitchen area, police noticed the odor of bleach. The police also recovered a number of items that had been taken from the Suburban. (Id., pp. 90-98). At the Knights Inn, police found Kmart shoeboxes and work boots. (Id., p. 82).

During a search warrant executed upon a trailer that had been occupied at one point by Petitioner, police found a cell phone with the number 989-412-0454. Smith had a cell with the number 989-992-8181. Police later determined that Petitioner had a cell phone with the number 989-412-0454. The police also determined that Darrian Grant, the male murder victim, had a cell with the number 313-205-5223. (Tr. 1/22/04, pp. 59-61). The home number for Ray and Smith was 989-771-0098. The number for Smith's mother was 989-755-6897. (Id., pp. 66-67). Police obtained phone records for Grant's 5223 phone, Smith's 8181 phone, and petitioner's 0454 phone. (Id., pp. 63-64). Petitioner also had a pre-paid phone card for which no records were available. (Id., pp. 65, 78). The only phone records attributed at trial to Petitioner actually involved a phone owned and registered to Manitra McMillan, whom the police identified as being a girlfriend. (Id., p. 79).

The records for the phone attributed by police to Darrian Grant indicated that from December 18, 2002, at 5:05 a.m. to 4:09 p.m. (around the time of his homicide) there were twelve calls from Petitioner's phone numbers to Grant's phone, eight calls

from Grant's phone to Petitioner's phone, and about six calls from Smith's numbers to

Grant's phone.  The average duration of all of these calls was under one minute. (Id.,

pp. 70-75).  The records for the phone 8181 attributed to Smith indicated that from

December 19, 2002, at 9:32 a.m. to 11:00 a.m. there were four calls from numbers

attributed to petitioner, three calls from numbers attributed to Grant, and about five calls

from Smith's number to Grant's number.  From 4:09 p.m. forward there were no more

calls between the numbers attributed to Petitioner, Smith, or Grant. (Id., pp. 79-83).

The records for the phone 0450 attributed by the police to Petitioner indicated that from

December 12, 2002, at 3:28 p.m. to December 20, 2002 at 12:08 p.m. there were

seventeen calls from this number to Grant's number, and about six calls from this

number to Smith. (Tr. 1/20/04, pp. 83-90).

Petitioner and Smith were tried separately.  Petitioner was found guilty by a jury.

Smith was acquitted of all charges.

## IV.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas

cases:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim–
>
> > (1)      resulted in a decision that was contrary to, or
> > involved an unreasonable application of, clearly
> > established Federal law, as determined by the Supreme
> > Court of the United States; or
> > (2)      resulted in a decision that was based on an

9

unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the

state court arrives at a conclusion opposite to that reached by the Supreme Court on a

question of law or if the state court decides a case differently than the Supreme Court

has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362,

405-06 (2000).  An "unreasonable application" occurs when "a state court decision

unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."

Id. at 409.  A federal habeas court may not "issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly." Id. at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a

state-court decision must be consistent with the respect due state courts in our federal

system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a

'highly deferential standard for evaluating state-court rulings,' and 'demands that

state-court decisions be given the benefit of the doubt.'" Renico v. Lett, 559 U.S. 766,

773 (2010)((quoting Lindh v. Murphy, 521 U.S. 320, 333, n. 7 (1997); Woodford v.

Viscotti, 537 U.S. 19, 24 (2002) (per curiam)).  "[A] state court's determination that a

claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S.

Ct. 770, 786 (2011)(citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  The

Supreme Court has emphasized "that even a strong case for relief does not mean the

state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade,

10

538 U.S. 63, 75 (2003)).  Furthermore, pursuant to § 2254(d), "a habeas court must

determine what arguments or theories supported or...could have supported, the state

court's decision; and then it must ask whether it is possible fairminded jurists could

disagree that those arguments or theories are inconsistent with the holding in a prior

decision" of the Supreme Court.  Id.

## V.  Analysis

### A.  Claim I - Tainted Jury

### 1.

Petitioner first claims that his right to a fair and impartial jury was violated

because the jury was tainted by an extraneous influence.  Petitioner says that several

of co-defendant Smith's family and friends were present during the trial and stared or

glared at the jurors.  Prior to the jury returning its verdict, trial counsel informed the trial

court that he had been advised by a member of the trial court's staff that a juror or

jurors stated that there were some "individual gentlemen" in the back of the courtroom

who had been "staring or glaring at them and possibly intimidating them."  Counsel

learned from Petitioner that these were family or friends of co-defendant Smith.

Counsel asked the trial court to ask the jurors if the verdict was affected by this

intimidation.  The trial court declined to do so. (Tr. 1/28/04, p. 33).

The Michigan Court of Appeals rejected this claim on direct appeal:

> Here, defendant has failed to prove that the jury was exposed to extraneous influences.  That codefendant Smith's family and friends were allegedly in the audience at the beginning of the trial "staring or glaring" at the jury, in open court, alone, is too speculative to lead to a conclusion of intimidation. Thus, the trial court properly denied defendant's request.

11

Arthur, Slip. Op. at * 3.

In Remmer v. United States, 347 U.S. 227, 230 (1954), the Supreme Court held that a trial court confronted with an allegation of external tampering or contact with a juror during a trial about a matter pending before the jury "should determine the circumstances, the impact [of the contact] upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."  However, a Remmer hearing is not required unless the defendant can show that the unauthorized juror contact "created actual juror bias." United States v. Frost, 125 F. 3d 346, 377 (6th Cir. 1997).

To be entitled to a Remmer hearing, a defendant "must do more than simply raise the possibility of bias." Jackson v. Bradshaw, 681 F. 3d 753, 766 (6th Cir. 2012). Instead, a defendant "must make a colorable claim of extraneous influence," that is, "one derived from specific knowledge about or a relationship with either the parties or their witnesses." Id.  "Examples of extraneous influences include 'prior business dealings with the defendant, applying to work for the local district attorney, conducting an [out-of-court] experiment, and discussing the trial with an employee.'" Id. (internal quotation omitted).  A trial court "should consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source when determining whether a hearing is required." Kowalak v. Scutt, 712 F. Supp. 2d 657, 692 (E.D. Mich. 2010)(quoting Sims v. Rowland, 414 F.3d 1148, 1155 (9th Cir. 2005)(internal quotation omitted).  To be entitled to a post-trial hearing on an extraneous influence claim, a defendant must "come[ ] forward with clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety

has occurred." Id. (internal quotation omitted).

Moreover, "[s]ince the trial judge is in the best position to determine the nature and extent of alleged jury misconduct, his decision on the scope of proceedings necessary to discover misconduct is reviewed only for an abuse of discretion." United States v. Rigsby, 45 F. 3d 120, 125 (6th Cir. 1995)(quoting United States v. Shackelford, 777 F. 2d 1141, 1145 (6th Cir. 1985)). Finally, in a habeas corpus case, a state court's findings on whether, and how, an extraneous matter affected jury deliberations "deserve[ ] a 'high measure of deference.'" Mahoney v. Vondergritt, 938 F. 2d 1490, 1492(1st Cir. 1991)(quoting Rushen v. Spain, 464 U.S. 114, 120 (1983)).

**2.**

Here, Petitioner is not entitled to habeas relief on his claim because he never presented any evidence of this alleged juror intimidation other than his trial counsel's own assertion of a hearsay statement that had been made to him. Petitioner's bare assertion of what his counsel was told by an unnamed member of the trial court's staff does not constitute evidence of an improper jury contact. Petitioner could have supported his claim by obtaining affidavits from the jurors or from the member of the court's staff who was allegedly informed of this contact. Because Petitioner's extraneous influence claim is conclusory and unsupported, he is not entitled to habeas relief. Kowalak, 712 F. Supp. 2d at 692-93.

Moreover, claims concerning the effect of extraneous influences upon the jury during deliberations are subject to a harmless error analysis. See Mason v. Mitchell, 320 F.3d 604, 638 (6th Cir. 2003). For purposes of federal habeas review, a constitutional error that implicates trial procedures is deemed harmless unless it had a

13

"substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  In the present case, the alleged juror intimidation by the co-defendant's family and friends did not have a substantial and injurious effect or influence upon the jury's verdict, in light of the evidence against Petitioner.  Overall, Petitioner is not entitled to habeas relief on his first claim.

### B.  Claims II and VII - Prosecutorial Misconduct

### 1.

In his second and seventh claims, Petitioner contends that he was deprived of a fair trial because of prosecutorial misconduct.[2]  "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." <u>Millender v. Adams</u>, 376 F.3d 520, 528 (6th Cir. 2004)(citing <u>Bowling v. Parker</u>, 344 F.3d 487, 512 (6th Cir. 2003)).  A prosecutor's improper comments will be held to violate a criminal defendant's constitutional rights only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986)(quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974)).  Prosecutorial misconduct will thus form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances.

---

[2]  Respondent contends that petitioner's seventh claim, which he raised for the first time in his amended habeas petition, is barred by the one year statute of limitations contained in 28 U.S.C. § 2244(d), because it does not relate back to the claims contained in the original habeas petition.  The statute of limitations, however, does not constitute a jurisdictional bar to habeas review, thus, a federal court, can, in the interest of judicial economy, proceed to the merits of a habeas petition. See <u>Smith v. State of Ohio Dept. of Rehabilitation</u>, 463 F. 3d 426, 429, n. 2 (6th Cir. 2006)(quoting <u>Trussell v. Bowersox</u>, 447 F. 3d 588, 590 (8th Cir. 2006)).  The interests of justice merit the Court considering the claim, regardless of whether it is timely.  This is particularly so because, as explained infra, Petitioner is not entitled to relief on this claim.

Donnelly v. DeChristoforo, 416 U.S. at 643-45.  The Court must focus on "'the fairness of the trial, not the culpability of the prosecutor.'"  Pritchett v. Pitcher, 117 F. 3d 959, 964 (6th Cir. 1997)(quoting Serra v. Michigan Dep't of Corr., 4 F. 3d 1348, 1355 (6th Cir. 1993)).  Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012)(quoting Harrington, 131 S. Ct., at 786–87).

## 2.

In his second claim, Petitioner says that the prosecutor committed misconduct by referring to him by his alias or nickname, "Frank Nitty."

The Michigan Court of Appeals rejected this claim:

> Next, defendant argues that repeated references to him as "Frank Nitty" was improper and denied him a fair and impartial trial. We disagree.  Because the lay witnesses only knew defendant as "Frank Nitty," reference to this alias "was necessary to show that defendant was the person to whom the testimony pertained."

Arthur, Slip. Op. at * 2.

The Court agrees with the court of appeals.  The prosecutor's references to petitioner by his alias or nickname of Frank Nitty was proper and relevant because at least some of the witnesses knew Petitioner by this name.  Because any references to petitioner's nickname were proper and did not necessarily mislead or prejudice the jury, the prosecutor did not commit misconduct by referring to petitioner by his alias or nickname. See Gillard v. Mitchell, 445 F.3d 883, 897 (6th Cir. 2006).  Moreover, in light

of the overwhelming evidence of guilt, the prosecutor's references to Petitioner's alias did not have a substantial or injurious influence on the verdict, so as to entitle petitioner to relief. Id. at 898.

In his seventh claim, Petitioner says that the prosecutor improperly elicited inflammatory and prejudicial testimony from Ray that she was afraid of Petitioner. The trial court on post-conviction review rejected this claim, concluding that defense counsel had opened the door to this question by asking Ray why, if she was afraid of her fiancee Smith, she did not implicate Petitioner in this crime from the beginning. People v. Arthur, No. 03-022745-FC, Slip. Op. at * 4-6 (Saginaw County Cir. Ct. April 8, 2010).

The trial court is correct. The prosecutor's question to Ray about whether she was afraid of Petitioner came only after defense counsel had opened the door to this question by asking Ray why she had not earlier implicated Petitioner in this shooting. Because defense counsel's question opened the door to the prosecutor's question to Ray about whether she was afraid of Petitioner, the trial court's rejection of Petitioner's prosecutorial misconduct claim was reasonable, thus, precluding habeas relief on this claim. See Sykes v. Wolfenbarger, 448 Fed. Appx. 563, 565 (6th Cir. 2011).

Overall, Petitioner is not entitled to habeas relief on his prosecutorial misconduct claims.

### C. Claim III - Ineffective Assistance of Counsel

### 1.

Petitioner next contends that he was denied the effective assistance of trial counsel. To show that he was denied the effective assistance of counsel under federal

16

constitutional standards, a defendant must satisfy a two prong test.  First, Petitioner must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 687 (1984).  In so doing, Petitioner must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. Id. In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. Strickland, 466 U.S. at 689.  Second, Petitioner must show that such performance prejudiced his defense. Id.  To demonstrate prejudice, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  "Strickland's test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'" Storey v. Vasbinder, 657 F.3d 372, 379 (6th Cir. 2011)(quoting Harrington, 131 S. Ct. at 792).  The Supreme Court's holding in Strickland places the burden on Petitioner and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. See Wong v. Belmontes, 558 U.S. 15, 27 (2009).

More importantly, on habeas review, "the question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)(quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).  "The pivotal question is whether the state court's application of

17

the Strickland standard was unreasonable. This is different from asking whether
defense counsel's performance fell below Strickland's standard." Harrington v. Richter,
131 S. Ct. at 785. Indeed, "because the Strickland standard is a general standard, a
state court has even more latitude to reasonably determine that a defendant has not
satisfied that standard." Knowles, 556 U.S. at 123 (citing Yarborough v. Alvarado, 541
U.S. at 664). Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial
review" applies to a Strickland claim brought by a habeas petitioner. Id. This means
that on habeas review of a state court conviction, "[A] state court must be granted a
deference and latitude that are not in operation when the case involves review under
the Strickland standard itself."Harrington, 131 S. Ct. at 785. "Surmounting Strickland's
high bar is never an easy task." Id. at 788 (quoting Padilla v. Kentucky, 559 U.S. 356,
371 (2010)).

Because of this doubly deferential standard, the Supreme Court has indicated
that:

> Federal habeas courts must guard against the danger of equating
> unreasonableness under Strickland with unreasonableness under § 2254(d).
> When § 2254(d) applies, the question is not whether counsel's actions were
> reasonable. The question is whether there is any reasonable argument that
> counsel satisfied Strickland's deferential standard.

Harrington v. Richter, 131 S. Ct. at 788. The Supreme Court has also indicated that
a reviewing court must not merely give defense counsel the benefit of the doubt, but must
also affirmatively entertain the range of possible reasons that counsel may have had for
proceeding as he or she did. Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011).

**2.**

18

Petitioner first claims that his trial counsel was ineffective for failing to impeach Ray regarding her testimony that she smelled bleach in her kitchen the night of the murders after petitioner and co-defendant Smith arrived there.  Petitioner argues that this statement contradicts Ray's subsequent testimony that she bought clothes for petitioner and Smith at Smith's behest.  Petitioner argues that "common sense" would dictate that if Smith and petitioner had been cleaning up with bleach in Ray's kitchen, then they would have already been wearing the purported replacement clothes purchased at Kmart.

Counsel cross-examined Ray about the fact although she claimed that her relationship with Smith was over, she had continued to correspond with him while he was in jail and admitted that she still loved him. (Tr. 1/21/04, pp. 187-88).  In response to counsel's questions, Ray acknowledged that many of the facts that she had testified to at trial she had failed to mention in her first, second, and third interviews with police, or during petitioner's preliminary examination.  Ray, in fact, acknowledged that many of these facts she mentioned only for the first time as she was preparing her trial testimony with the prosecutor. (Id., pp. 190, 199).  Counsel elicited from Ray testimony that Draine never gave an indication that he was forced into doing anything, which impeached Draine's testimony that he participated in the crime because he was afraid of petitioner and Smith. (Id., pp. 200-01).  Finally, although counsel did not question Ray about the discrepancy concerning the Kmart clothes, he brought this discrepancy to the jurors' attention in closing argument and noted that Ray only mentioned this after being granted immunity from prosecution. (Tr. 1/27/04, pp. 41-42).

Under these circumstances, trial counsel's performance did not constitute

19

ineffective assistance of counsel where the record shows that defense counsel carefully cross-examined Christina Ray and in his closing argument emphasized the inconsistencies and weaknesses of her testimony, as well as her possible motivations for fabricating these charges against Petitioner.  Habeas relief is not warranted on this ground.

Petitioner next claims that trial counsel was ineffective for failing during closing argument to place into "context" the telephone records, which indicated that calls had been made to and from the cell phones of petitioner, co-defendant Smith, and victim Darrian Grant during mid-December of 2002.

Trial counsel did, in fact, place the telephone records into context when he made the following remarks in closing argument:

> The prosecution relies a lot on phone calls, the fact that phone calls were made, yet the point remains there is no evidence as to what was discussed in these phone calls. And then relying on those phone calls to establish a conspiracy is just a suggestion.  Again, no proof, proof you need.  I'm not trying to paint a halo above [Petitioner's] head.  He's not a saint.  He's not a murderer either.  The proofs haven't established that.

(Tr. 1/27/04, pp. 40-41).

Trial's counsel's closing argument adequately attacked the evidentiary strength of the cell phone records.  While the right to effective assistance of counsel extends to closing arguments, counsel nonetheless has wide latitude in deciding how best to represent a criminal defendant, and deference to a defense counsel's decisions in his closing argument is particularly important because of the broad range of legitimate defense strategies at that stage. Yarborough v. Gentry, 540 U.S.1, 5-6 (2003).  Judicial review of a defense attorney's summation must therefore be highly deferential and is

"doubly deferential when it is conducted through the lense of federal habeas." Id. Accordingly, Petitioner is not entitled to habeas relief on this claim.

Petitioner next contends that trial counsel was ineffective for failing to call Vanessa Green as a witness.  A defense counsel has no obligation to present evidence or testimony that would not have exculpated the defendant. See Millender v. Adams, 376 F. 3d 520, 527 (6th Cir. 2004)(internal quotation omitted).  Green did not actually witness the shooting nor did she see the bodies.  Moreover, according to the detective who took her statement, he believed that Green was lying on Smith's behalf.  Because there is no indication that Green would have provided exculpatory evidence, Petitioner was not prejudiced by counsel's failure to call her as a witness.  Petitioner is not entitled to habeas relief on this ground.

Petitioner lastly contends that his trial counsel was ineffective for failing to object to prosecutorial misconduct.  To show prejudice under Strickland for failing to object to prosecutorial misconduct, a habeas petitioner must show that but for the alleged error of his trial counsel in failing to object to the prosecutor's improper questions and arguments, there is a reasonable probability that the proceeding would have been different.  Hinkle v. Randle, 271 F. 3d 239, 245 (6th Cir. 2001).  Because the Court has already determined that the prosecutor's comments and questions did not deprive Petitioner of a fundamentally fair trial, Petitioner is unable to establish that he was prejudiced by counsel's failure to object to these remarks. See Slagle v. Bagley, 457 F. 3d 501, 528 (6th Cir. 2006).

In sum, Petitioner's ineffective assistance of counsel claims are without merit.

21

### D.  Claim IV - Confrontation Clause

In his fourth claim, Petitioner contends that his right to confrontation was violated by the admission of out-of-court statements made by his co-defendant Smith to Draine, Neal, or Ray.

This claim fails because Smith did not make his statements to law enforcement but to friends and acquaintances.  The Confrontation Clause is not implicated, and thus does not need not be considered, when non-testimonial hearsay is at issue. See Davis v. Washington, 547 U. S. 813, 823-26 (2006); See also Desai v. Booker, 538 F.3d 424, 425-26 (6th Cir. 2008).  Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy. Crawford v. Washington, 541 U.S. 36, 51-52, 56 (2004).  In holding that the Sixth Amendment right to confrontation does not apply to non-testimonial statements, the Supreme Court stated:

> "The text of the Confrontation Clause reflects this focus [on testimonial hearsay].  It applies to 'witnesses' against the accused-in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828).  'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' Ibid.  An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."

Davis, 547 U.S. at 823-24 (quoting Crawford, 541 U.S. at 51).

Smith's statements to Drain, Neal, or Ray do not constitute "testimonial" hearsay under Crawford, because the remarks were made to friends or acquaintances. United States v. Franklin, 415 F.3d 537, 545-46 (6th Cir. 2005)(citing cases)(casual statements to family and acquaintances nontestimonial under Crawford).  Petitioner is not entitled

22

to habeas relief on his fourth claim.

### E.  Claim V - Sufficiency of the Evidence

#### 1.

Petitioner next contends that there was insufficient evidence to establish his

participation in the crimes.

The Michigan Court of Appeals rejected petitioner's claim:

In this case there was ample evidence of defendant's participation in the crimes.  In brief, the evidence included: (1) Draine's testimony that (a) Smith picked up defendant and brought him to the motel room, (b) Draine heard Smith and defendant speaking about committing the crimes, (c) Smith and defendant left the motel and then later returned with blood on their clothes, wearing rubber gloves and, (d) shortly thereafter Draine saw the blood and dead bodies in the Suburban; (2) Neal testified that she spoke to defendant on Smith's cell phone, saw defendant in the motel room, and spoke to defendant on the motel phone several times that night; (3) Ray testified that she saw defendant at her house and drove him and Smith to the motel after they cleaned up a "mess," and later she saw defendant at the motel and he was wearing a jogging suit that she purchased from Kmart; (4) stereo and other equipment from the Suburban was found at Carlton Tinsley's house and Smith's house, and (5) the cell phone records indicate several calls placed by defendant and Smith to one of the victims days before the murder and on the day of the murder.  In sum, there was sufficient evidence for a rational trier of fact to have found all the elements of murder and carjacking proved beyond a reasonable doubt.

Arthur, Slip. Op. at * 3.

It is beyond question that "the Due Process Clause protects the accused against

conviction except upon proof beyond a reasonable doubt of every fact necessary to

constitute the crime with which he is charged." In Re Winship, 397 U.S. 358, 364

(1970).  But the critical inquiry on review of the sufficiency of the evidence to support a

criminal conviction is, "whether the record evidence could reasonably support a finding

of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979).

This inquiry, however, does not require a court to "ask itself whether <u>it</u> believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>Id.</u> at 318-19(internal citation and footnote omitted)(emphasis in the original). Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence at trial to exclude every reasonable hypothesis except that of guilt. <u>Johnson v. Coyle,</u> 200 F. 3d 987, 992 (6th Cir. 2000)(internal quotations omitted).

More importantly, a federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the <u>Jackson</u> standard. See <u>Cavazos v. Smith,</u> 132 S. Ct. 2, 4 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." <u>Id.</u> In fact, the <u>Jackson</u> standard "is so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" <u>Davis v. Lafler</u>, 658 F. 3d 525, 534 (6th Cir. 2011)(quoting <u>United States v. Oros</u>, 578 F.3d 703, 710 (7th Cir. 2009)(internal quotation marks omitted)). Therefore, for a federal habeas court reviewing the sufficiency of evidence for a state court conviction, "the only question under <u>Jackson</u> is whether that finding was so insupportable as to fall below the

24

threshold of bare rationality." Coleman v. Johnson, 132 S.Ct. 2060, 2065 (2012).

Finally, on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. Marshall v. Lonberger, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. Neal v. Morris, 972 F.2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir.2003).

## 2.

Petitioner does not allege that the evidence, if believed, failed to establish the elements of the offenses. Instead, Petitioner challenges the sufficiency of the evidence on the ground that the prosecution witnesses' were not credible and that their testimony was not corroborated by any physical evidence, such as fingerprints or DNA.

Attacks on witness credibility are simply challenges to the quality of the prosecution's evidence, and not to the sufficiency of the evidence. Martin v. Mitchell, 280 F. 3d 594, 618 (6th Cir. 2002). An assessment of the credibility of witnesses is therefore generally beyond the scope of federal habeas review of sufficiency of evidence claims. Gall v. Parker, 231 F. 3d 265, 286 (6th Cir. 2000). The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim. Id.

Petitioner's insufficiency of evidence claim rests on an allegation of the witnesses' credibility, which is the province of the jury. Petitioner is therefore not entitled to habeas relief on this claim. See Tyler v. Mitchell, 416 F. 3d 500, 505 (6th Cir. 2005).

25

### F. Claim VI - Missing Transcripts

In his sixth claim, Petitioner says that his right to a meaningful appeal was violated because the trial court denied his request for the production of transcripts from his co-defendant Smith's separate trial.

The Sixth Circuit has stated that "federal habeas relief based on a missing transcript will only be granted where the petitioner can show prejudice." Scott v. Elo, 302 F. 3d 598, 604 (6th Cir. 2002) (citing Bransford v. Brown, 806 F. 2d 83, 86 (6th Cir. 1986)).  Although the Sixth Circuit has recognized the difficulty in demonstrating prejudice where the transcripts are missing, a habeas petitioner must nonetheless "present something more than gross speculation that the transcripts were requisite to a fair appeal." Bransford, 806 F. 2d at 86.

Petitioner has offered nothing more than speculation that the transcripts from his co-defendant's trial would have assisted him with his appeal.  Accordingly, Petitioner is not entitled to habeas relief on his final claim.

### VI.  Conclusion

For the reasons stated above, the state courts' rejection of Petitioner's claims did not result in decisions that were contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts.  Accordingly, the petition for a writ of habeas corpus is **DENIED.**

Furthermore, reasonable jurists would not debate the Court's assessment of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed

26

further.  The Court therefore **DECLINES** to grant a certificate of appealability under 28 U.S.C. § 2253(c)(2). [3] See <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  However, if Petitioner chooses to appeal the Court's decision, he may proceed <u>in forma pauperis</u> on appeal because an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3).

     **SO ORDERED.**


     _S/Avern Cohn_____
     AVERN COHN
     UNITED STATES DISTRICT JUDGE


Dated:  March 27, 2014


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 27, 2014, by electronic and/or ordinary mail.


     S/Sakne Chami_____
     Case Manager, (313) 234-5160

---

[3] "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.